# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-18-00036-CR
---

**Ronald Deshon Runels, Appellant**

**v.**

**The State of Texas, Appellee**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 450TH JUDICIAL DISTRICT**
**NO. D-1-DC-16-302170, HONORABLE BRAD URRUTIA, JUDGE PRESIDING**
---

### M E M O R A N D U M   O P I N I O N

Ronald Deshon Runels was charged with aggravated assault family violence for allegedly assaulting his girlfriend Sharon Holder by stabbing her "on or about her hand" and for using or exhibiting "a deadly weapon, to-wit: a knife, during the commission of the" assault. *See* Tex. Penal Code §§ 22.01(a) (listing elements of offense of assault), .02(a)-(b)(1) (providing that defendant commits aggravated assault if he "causes serious bodily injury to another" and that offense is first-degree felony if defendant uses deadly weapon "and causes serious bodily injury to a person whose relationship to or association with the defendant is described by" provisions of Family Code). The indictment also contained enhancement paragraphs alleging that Runels had previously been convicted of two felony offenses. At the end of the guilt-or-innocence phase, the jury found Runels guilty of the charged offense. At the end of the punishment phase, the jury found the enhancement allegations to be true and sentenced Runels to twenty-six years' imprisonment.

*See id.* § 12.42(d) (enhancing punishment range for felony offense if defendant has previously been convicted sequentially of two felony offenses). The district court rendered its judgment of conviction in accordance with the jury's verdicts. In two issues on appeal, Runels contends that the district court erred by admitting into evidence testimony regarding the dynamics of domestic violence and by failing to include an instruction for self-defense in the jury charge. We will modify the district court's judgment of conviction to correct a clerical error and affirm the district court's judgment as modified.

## BACKGROUND

As set out above, Runels was charged with assaulting Holder. During the trial, undisputed evidence established that Runels and Holder were temporarily living in Holder's car at the time of the alleged offense and that Holder suffered a stab wound to her hand while Runels and Holder were in the car. After being injured, Holder went to work, was driven by one of her co-workers to an urgent care clinic, and was treated for the wound to her hand. While Holder was being treated, one of the clinic's employees called the police, and Runels was arrested after Holder gave a statement to the police. During the trial, the State called various witnesses to the stand, including Holder; the co-worker who drove Holder to the clinic, Tiffany Perry; the nurse who treated Holder, Andrew Stone; the doctor who treated Holder, Dr. Shannon Casey; police officers who participated in the investigation, Officer Crystal Cruz and Officer Billy Brown; and an expert witness, Jeannie Tomanetz. When presenting his defense, Runels called his friend David Martinez as a witness.

In her testimony, Holder explained that she had been dating Runels for several months before the alleged assault and that Runels had been abusive to her on prior occasions. When discussing some of the previous incidents, Holder testified that Runels pushed her around in the

2

parking lot where she worked, that Runels later came into the office near the end of her shift, that Runels "threatened to tear up the . . . medication books" that she was working on, and that one of her co-workers called the police. Regarding another incident, Holder related that Runels tried to strangle her. When discussing the alleged assault in question, Holder testified that she started "fussing at" Runels for not waking her up, that Runels took a knife out while she was driving, that he "pulled the steering wheel," that she pulled over to the side of the road, that he started threatening to kill her and himself, that he moved the knife toward her neck, that she stuck her hand out to stop him, that the knife "went into" her hand, and that the wound started bleeding. In addition, Holder stated that Runels initially did not want her to go to work after the incident but later changed his mind and that he took all of her "I.D.s and [her] credit card and said don't do anything stupid, don't call the police." Moreover, Holder recalled that after Runels was arrested, he sent her letters from jail, asserted that the incident was her fault for fighting with him, asked her to drop the charges, and threatened to ruin her career if she did not drop the charges. Plus, Holder explained that she did not want to testify in this case and was only testifying because a subpoena had been issued requiring her to testify.

While cross-examining Holder, Runels repeatedly asked her about her recollection of the events in question and whether her testimony contradicted statements that she previously made to the police, and Runels also questioned Holder regarding whether one of the previous acts of alleged abuse was something that she wanted to happen and found pleasurable. During her cross-examination, Holder stated that she may have "accidentally grabbed" the blade while defending herself to keep the knife from cutting her neck. Moreover, Holder related that while Runels was in

3

jail, she talked with him on the phone "a lot," discussed sexual topics with him on the phone, wrote letters to him, provided him with her new address after she moved, and tried to visit him at the jail even though there was a protective order prohibiting him from communicating with her. Additionally, Holder admitted that she may have not taken her medication on the day in question, that not taking her medication can cause her to get emotional, and that she "probably" told Runels that not taking her medicine that day made her "crazy." Finally, Holder testified that she and Runels had previously argued over whether he was romantically involved with other women and that part of the reason that she stopped talking to Runels while he was in jail was because she believed that he was still involved with other women.

During the trial, the State also called Perry to the stand. Perry testified that she was one of Holder's co-workers and that Holder arrived at the office with a wound to her hand on the day in question. Regarding her interactions with Holder, Perry recalled that Holder stated that she was worried that Runels was going to kill her, that Runels "pulled a knife on her" while she was driving, that Runels put the knife to her neck, and that her hand was cut during "the tussle." Perry also testified regarding other acts of abuse that she witnessed Runels commit against Holder. Regarding an incident that occurred approximately one month before the incident in question, Perry related that Runels came to see Holder at work, that Runels threatened Holder and tried to stop her from doing her work, that Holder asked Runels to leave, and that another co-worker called the police. Plus, Perry stated that she saw Runels and Holder near Holder's car later that same day and that he "had his hand around her throat like he was choking her."

In addition, the State called Stone and Dr. Casey to the stand to discuss their interactions with Holder on the day in question. In his testimony, Stone explained that he treated

4

Holder's injuries and that Holder stated that she had been in an argument with Runels, that the argument escalated, and that she was injured when she "was defending herself with her left hand." Dr. Casey testified that she treated Holder's injury, that Holder stated that Runels stabbed her in her hand when she tried to get out of the car, and that she tried to protect herself. During Stone's testimony, medical records regarding Holder's injury and treatment were admitted into evidence.

When called to the stand, Officer Cruz testified that she responded to a 911 call regarding Holder and that Holder told Officer Cruz that Runels assaulted Holder. More specifically, Officer Cruz detailed that Holder stated that she and Runels argued, that Runels "produced a knife," that Runels held the knife "up to her eye," that Runels "swung the knife towards her," that she tried to get out of the way, that "she put her hands out there in an attempt to block the blade," that "the knife struck her hand," that she "accidentally grabbed the knife," and that the knife cut her hand. Furthermore, Officer Cruz testified that Holder stated that Runels threatened to kill her and himself if she tried to leave him. In addition, Officer Cruz explained that Holder discussed how Runels "took her wallet, . . . keys," "[d]river's licen[s]e, medical cards, credit cards, [and] anything of identifying matter" in order to keep her from doing "anything foolish" after arriving at work and that those types of identity cards would be needed when seeking medical treatment and purchasing a bus or plane ticket. During her cross-examination, Officer Cruz stated that when she first talked with Holder, Holder stated that she was "to blame" but also explained that she accidentally grabbed the blade while trying to protect herself. During Officer Cruz's testimony, photographs of Holder's injuries were admitted into evidence.

In his testimony, Officer Brown testified that he drove Runels to jail after Runels was arrested. Next, Officer Brown testified that at the jail Holder's driver's license and other identity cards were found inside Runels's shoe. Moreover, Officer Brown related that he did not notice any injuries on Runels and that Runels did not mention being injured.

Finally, the State called Tomanetz to the stand to testify as an expert in the field of domestic violence, and the district court overruled Runels's objection to allowing Tomanetz to testify as an expert but granted Runels's request for a running objection to the testimony. In her testimony, Tomanetz discussed her training and experience and explained that she was "a victim services counselor" for the Austin Police Department Victim Services Unit. Further, Tomanetz testified that there are common patterns involved in family violence and that one of those patterns is called the cycle of violence. Regarding the repeating cycle of violence, Tomanetz explained that "[i]t starts out with the tension-building phase" in which arguments increase in frequency and in which the victim attempts to placate the abuser. Next, Tomanetz described the "[c]risis phase or the acute phase" in which an "actual incident of violence" occurs and in which law-enforcement may become involved. Then, Tomanetz testified regarding the honeymoon phase in which the couple makes up and in which the abuser apologizes for his actions but also minimizes his misconduct.

After finishing her testimony regarding the cycle of violence, Tomanetz discussed "the power and control wheel." Specifically, Tomanetz related that she uses the wheel as a way to discuss with domestic-violence victims "the tactics that" abusers use "to keep their power and control over their victims." When elaborating on those tactics, Tomanetz stated that abusers use coercion, intimidation, emotional abuse, and threats to control their victims between incidents of

6

violence. As an example, Tomanetz stated that abusers will often threaten to kill themselves if they believe the victims are contemplating leaving. Furthermore, Tomanetz explained that this type of behavior "escalates in modality and severity over time." During her testimony, copies of exhibits depicting the cycle of violence and the power-and-control wheel were admitted "for demonstrative purposes only."

In addition, during her testimony, Tomanetz discussed what can occur after an abuser has been arrested. In particular, Tomanetz related that the victims may seek to have the charges dismissed and may continue to communicate with the abusers while the abusers are in jail because they want to believe the abusers' stories that they will not hurt the victims again and because the victims may have worked very hard to make their relationships work. Moreover, Tomanetz explained that a victim of domestic abuse will often attempt to cover up the abuse in order to protect the abuser.

When presenting his defense, Runels called his friend Martinez to the stand. In his testimony, Martinez related that Holder was a jealous person and would call Runels repeatedly while Runels was with Martinez in order to check up on Runels and see whom Runels was socializing with. Further, Martinez explained that he regularly talked with Holder after Runels was arrested. Regarding one conversation, Martinez agreed that Holder stated "that she pulled the knife out first, that [Runels] grabbed it," and that "then she tried to grab it back and that's how she got cut."

During the jury-charge conference, Runels requested an instruction on self-defense, but the district court denied that request. Following the parties' closing arguments, the jury found Runels guilty of the charged offense. Runels appeals the district court's judgment of conviction.

7

## DISCUSSION

**Testimony Regarding Domestic Violence**

In his first issue on appeal, Runels argues that the district "court erred in admitting expert testimony on domestic violence dynamics."

Under the Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Appellate courts review the admission of expert testimony for an abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).

"Before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case." *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance."[1] *Id.* "Considering the

---

[1] In its appellee's brief, the State argues that Runels only objected to the reliability of the expert's testimony and did not challenge the witness's qualifications or the relevancy of the testimony. For that reason, the State urges that Runels failed to preserve any issue regarding the

reliability of proffered expert testimony in a 'soft' science field like the social sciences, those based primarily on experience and training rather than a rigorous scientific method, the trial court should" consider the following: "(1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field." *Brewer v. State*, 370 S.W.3d 471, 473 (Tex. App.—Amarillo 2012, no pet.). For expert testimony to be admissible under Rule 702, "the party offering the scientific expert testimony must demonstrate, by clear and convincing evidence, that such testimony 'is sufficiently reliable and relevant to help the jury in reaching accurate results.'" *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (quoting *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)).

Various courts have determined that expert testimony regarding domestic violence is "admissible to explain recantations, delays in reporting, lies to the police, and why a complainant would continue living with a family member after an alleged assault" because "the average juror will not typically be familiar with the effect of domestic violence on victims and the dynamics of the relationship between abuser and victim." *See Nwaiwu v. State*, No. 02-17-00053-CR, 2018 WL 3763899, at *3 (Tex. App.—Fort Worth Aug. 9, 2018, pet. filed) (mem. op., not designated for publication) (citing *Salinas v. State*, 426 S.W.3d 318, 323 (Tex. App.—Houston [14th Dist.] 2014), *rev'd on other grounds*, 464 S.W.3d 363 (Tex. Crim. App. 2015); *Dixon v. State*, 244 S.W.3d 472,

---

latter two requirements. *See* Tex. R. App. P. 33.1 (setting out procedure for preserving appellate issue); *see also Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (noting that "[t]he three requirements raise distinct questions and issues" and that "an objection based on one of these requirements does not preserve error as to another"). For purposes of resolving this issue on appeal, we will assume without deciding that Runels challenged all three requirements.

9

480 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *Scugoza v. State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no pet.)). Further, courts have determined that an expert witness may "testify about domestic violence in general and the typical behaviors of victims of abuse even though the witness has no personal knowledge of the defendant and victim." *Id.* (citing *Scugoza*, 949 S.W.2d at 363); *see also Scugoza*, 949 S.W.2d at 363 (noting distinction between direct expert testimony regarding truthfulness of witness, which would not be admissible, and expert testimony stating that witness's behavior fell within common pattern).

*Qualification*

In his brief, Runels argues that the State failed to establish that Tomanetz was qualified to testify as an expert regarding domestic violence. As support for this proposition, Runels notes that in a hearing held outside the presence of the jury, Tomanetz admitted that she has not personally conducted any research or studies regarding domestic violence. Further, Runels asserts that Tomanetz's testimony "relied solely on two studies that she could not describe." Finally, Runels argues that "the State did not show the matters related by Tomanetz are not common knowledge" and that "the models she described [would be] helpful in resolving the issues in the case."

As noted by Runels, Tomanetz related that her testimony would be based extensively on the following two concepts: the cycle of violence and the power-and-control wheel. Although Tomanetz admitted that she did not know what scientific methods were used in the studies leading to those concepts, she also explained that those concepts are regularly discussed in the context of domestic violence. In addition, although Runels correctly points out that Tomanetz admitted that

10

she had not personally published an article in the area of domestic violence, she explained that she had contributed to domestic-violence studies conducted by other researchers.

More importantly, Tomanetz related that she has been a victim-services counselor for victims of domestic violence for the last seventeen years, that she has a bachelor's degree in psychology, that she has a master's degree in clinical psychology, that she works on approximately 100 domestic-violence cases per month, that she has worked on crisis teams that respond to the scenes of domestic violence, that she has been part of the Travis County task force against family violence, that she has given "trainings" on the subject of domestic violence, that she helped prepare "the curriculum" regarding domestic violence "used at the training academy for [the] Austin Police Department," and that she has attended various workshops on domestic violence as part of her continuing education requirements. Further, Tomanetz stated that she previously provided expert testimony regarding domestic violence in approximately thirty trials, that she has over twenty years of experience in the field of domestic violence, and that her specialized knowledge goes beyond what the average person would know about domestic violence.

In light of the preceding and given our standard of review, we cannot conclude that the district court abused its discretion by determining that Tomanetz was qualified to provide expert testimony regarding the dynamics of domestic violence. *See Nwaiwu*, 2018 WL 3763899, at *4 (concluding that trial court did not abuse its discretion by determining that counselor could provide expert testimony "regarding domestic violence in general terms" where testimony established that counselor had "a master's degree in marriage and family therapy," "worked with approximately 1500 domestic violence victims over the past eleven years," "co-wrote a family

11

therapy book," "taught classes on the dynamics of family violence relationships," and "testified as a domestic-violence expert before"); *Lessner v. State*, No. 02-15-00400-CR, 2016 WL 4473263, at *1-3 (Tex. App.—Fort Worth Aug. 25, 2016, no pet.) (mem. op., not designated for publication) (deciding that licensed master social worker who was executive director of family crisis center was qualified to give expert testimony regarding dynamics of family violence and "typical behavior of domestic violence victims in relation to their abusers").

*Reliability*

When challenging the district court's ruling concerning Tomanetz's testimony, Runels also contends that Tomanetz's testimony was not reliable. In particular, Runels notes that Tomanetz stated during a hearing held outside the presence of the jury that she was not sure if the study of domestic violence qualified as a "science." Further, Runels highlights that Tomanetz was not able to describe the methodology that was used to develop the concepts of the cycle of violence and the power-and-control wheel that formed the basis of her testimony, to explain whether those studies had been peer reviewed, and to relate whether attempts had been made to replicate the findings from those studies.

As support for his assertion that Tomanetz's testimony was not reliable, Runels primarily relies on *Fowler v. State*, 958 S.W.2d 853 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999). In *Fowler*, our sister court determined that a trial court abused its discretion by allowing a psychologist to testify regarding her counseling of the victim in question and "regarding domestic violence and the problems it creates for the victims generally." *Id.* at 860, 864. Specifically, our sister court concluded that no attempt was made to explain the underlying theories and that no

12

evidence was introduced establishing that the psychologist's theories were "accepted as valid," that "a single piece of literature had been written to support her testimony," or that the psychologist "had ever conducted research to test the validity of her theories or been subjected to peer review." *Id.* at 864.

We find *Fowler* to be distinguishable from this case. Although Tomanetz was unable to describe the methodology used to create the concepts of the cycle of violence and the power-and-control wheel and could not specify whether those prior studies had been peer reviewed or whether attempts to replicate the studies' findings had been made, she explained that those concepts were developed decades ago through two studies, that the results of those studies were published, that those concepts have been studied for years, and that her testimony would be based on those concepts. Moreover, appellate courts have found testimony by counselors regarding those concepts to be sufficiently reliable to uphold determinations that the counselors should be allowed to testify as experts. *See Nwaiwu*, 2018 WL 3763899, at *2, *3 (determining that testimony from counselor, including portion "explain[ing] the power-and-control wheel," "was reliable"); *Brewer*, 370 S.W.3d at 472, 474 (upholding trial court's ruling allowing counselor to provide expert testimony regarding "the three stage 'cycle of violence'" and disagreeing with defendant's assertion that "her testimony [was] unreliable"). Additionally, Tomanetz related that her testimony would be based on her observations that she has made through her interactions with domestic-violence victims over her career and that she has developed specialized knowledge over a twenty-year period. Further, Tomanetz testified that the field of study of the dynamics of domestic violence is a legitimate one. Finally,

13

Tomanetz communicated that her testimony was based on principles relied on in the "domestic violence field."

In light of this testimony and given our standard of review, we must conclude that the district court did not abuse its discretion by determining that Tomanetz's testimony was reliable or, stated differently, appropriate for expert testimony. *Cf. Brewer*, 370 S.W.3d at 474 (determining that although counselor was unable "to cite empirical studies or data," trial court did not abuse its discretion by determining that her testimony regarding "the 'cycle of violence' in family violence cases" was reliable where counselor testified that "her testimony on the 'cycle of violence' would be 'standard in the industry,'" where counselor's testimony "was consistent with that found to be admissible in similar cases and elsewhere used in her profession," and where counselor's testimony "was illustrated with examples from her own experience").

*Relevance*

In his next set of arguments challenging the ruling on Tomanetz's testimony, Runels contends that Tomanetz's testimony was not relevant because his defense "did not focus on any of the factors described by Tomanetz['s] testimony." More specifically, Runels urges that because he only presented a self-defense claim during the trial, Tomanetz's testimony "must have been relevant to rebut that theory rather than to show the complainant may have suffered abuse conforming with a pattern." Moreover, Runels argues that the district court abused its discretion by allowing Tomanetz to testify because, unlike in other cases, the testimony regarding domestic abuse was not necessary to rehabilitate an "impeached defendant," *see Fielder v. State*, 756 S.W.2d 309, 315-16,

14

319-21 (Tex. Crim. App. 1988) (determining that trial court erred by failing to allow defendant to present evidence from psychologist regarding why women "stay in abusive situations" when State sought to establish that defendant "was *not* afraid of" victim at time of shooting even though victim committed "violent acts during the marriage"), or explain "a delay in reporting or a recantation," *see Nwaiwu*, 2018 WL 3763899, at *2, *4 (noting that expert witness testified regarding "cycle of violence" and regarding "the power-and-control wheel" and deciding that testimony "was relevant to explain why a victim of abuse would change her story regarding an abusive incident and why a victim might testify on behalf of her alleged abuser"); *Brewer*, 370 S.W.3d at 472, 474 (affirming trial court's decision to admit testimony from counselor regarding why "victims of domestic abuse delay reporting" when evidence showed that victim did not report abuse for several days).[2]

As set out previously, evidence concerning prior acts of domestic violence committed by Runels against Holder was presented through the testimony of Holder and Perry. Furthermore, Holder testified regarding controlling behavior exhibited by Runels, including taking all of her

---

[2] In his brief, Runels points to a prior opinion of this Court in which we determined that a trial court erred by overruling an objection to the admission of testimony regarding the dynamics of domestic violence. *See Gonzalez v. State*, No. 03-07-00323-CR, 2008 WL 2736889 (Tex. App.—Austin July 10, 2008, pet. ref'd) (mem. op., not designated for publication). However, we believe that Runels's reliance on *Gonzalez* is misplaced. First, the appellate issue in *Gonzalez* was whether it was error to admit the testimony over an objection under Rule of Evidence 403; in contrast, the issue in this case is whether the district court abused its discretion by allowing Tomanetz to testify under Rule of Evidence 702. *Id.* at *4-5. In addition, in *Gonzalez*, this Court explained that testimony regarding the dynamics of abuse "had little relevance to the case" because "[t]he complainant did not display the behavior of the 'typical' abused spouse as described by" witness at trial where complainant "did not delay making her outcry" and where complainant's "testimony was consistent with her initial outcry." *Id.* at *5. In contrast, as set out more thoroughly above, in this case there was testimony presented that Holder did engage in behavior consistent with the testimony regarding the dynamics of domestic violence by, among other things, continuing to communicate with Runels after he was arrested and staying in the relationship after previous acts of abuse.

identification documents in an effort to keep her from reporting the incident to the police and from leaving him and pressuring her to have the charges dropped. In addition, Holder explained that she did not want to testify at trial despite the injury that she sustained. Perhaps more importantly, prior to Tomanetz testifying, Runels attempted to undermine the credibility of Holder's testimony asserting that Runels assaulted her by questioning her regarding whether she continued to communicate with Runels after the alleged offense in question, regarding the frequency of those communications, and regarding the nature of those communications. Finally, Tomanetz stated that the public is not that well-informed on the subject of domestic violence and that her testimony would aid the jury in understanding the issues in this case.

Accordingly, we cannot conclude that the district court abused its discretion by determining that Tomanetz's testimony regarding the general dynamics of domestic violence was relevant in this case. *See Rodriguez-Linares v. State*, No. 03-14-00324-CR, 2015 WL 4512268, at *1, *2 (Tex. App.—Austin July 24, 2015, no pet.) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion when it admitted expert testimony regarding power-and-control wheel because evidence was relevant to assess victim's "seemingly inconsistent behavior toward someone who had sexually assaulted her" where defendant cross-examined victim regarding, among other things, whether she allowed defendant to stay with her after alleged assault); *see also Capello v. State*, No. 03-05-00553-CR, 2006 WL 2453021, at *4 (Tex. App.—Austin Aug. 25, 2006, pet. ref'd) (mem. op., not designated for publication) (determining that expert testimony on domestic violence was relevant and stating that "[t]he average juror cannot be expected to be familiar with how typical victims of domestic violence behave").

16

For all of these reasons, we cannot conclude that the district court abused its discretion by allowing Tomanetz to testify as an expert witness.

*Harm*

Even assuming for the sake of argument that the district court abused its discretion by allowing Tomanetz to testify as an expert witness, we would be unable to sustain Runels's appellate issue.

In general, "the erroneous admission or exclusion of evidence is nonconstitutional error governed by rule 44.2(b) if the trial court[']s ruling merely offends the rules of evidence." *Crockett v. State*, No. 02-11-00185-CR, 2012 WL 2135599, at *2 (Tex. App.—Fort Worth June 14, 2012, pet. ref'd) (mem. op., not designated for publication). For nonconstitutional errors in criminal cases, the error must be disregarded unless it affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). A substantial right is not affected "when, after examining the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury or had but a slight effect." *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005). "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even

17

voir dire, if applicable." *Id.* at 355-56. Additionally, reviewing courts may examine "whether the State emphasized the error." *Id.* at 356.

When asserting that he was harmed by the admission of Tomanetz's testimony, Runels contends that Tomanetz's testimony regarding the dynamics of domestic violence and the admission of the exhibits regarding the power-and-control wheel and the cycle of violence essentially accused Runels of engaging in extraneous misconduct such as threatening Holder, humiliating her, taking her money, emotionally abusing her, physically abusing her, and sexually abusing her. Moreover, Runels argues that because Tomanetz's testimony "was presented as expert scientific testimony, the complained of evidence was more than likely to be highly and unduly persuasive." *See Coble v. State*, 330 S.W.3d 253, 281, 286 (Tex. Crim. App. 2010) (noting various articles describing "the high persuasive value of 'scientific' expert testimony" before concluding that erroneous admission of expert's testimony was not harmful).

Although Tomanetz testified regarding general behaviors that abusers may engage in and although the exhibits relied on by Tomanetz listed certain types of misconduct that abusers may commit, Tomanetz made no assertion indicating that Runels engaged in any of those kinds of behaviors; on the contrary, Tomanetz explained in her testimony that she did not "know anything about th[is] case." Similarly, Tomanetz related that although there are common tactics used in abusive relationships, "not every tactic" would be used in "every relationship." Furthermore, although Holder and Perry testified regarding prior acts of alleged domestic violence and although testimony was presented regarding controlling behavior that Runels allegedly engaged in, Tomanetz did not provide any testimony regarding those alleged prior acts.

18

Additionally, evidence of Runels's guilt was admitted through the testimony of Holder, Perry, Stone, Dr. Casey, Officer Cruz, and Officer Brown, and photographs of Holder's injury as well as medical records detailing the seriousness of the injury were all admitted into evidence during the trial. Moreover, the admission of Tomanetz's testimony did not prohibit Runels from presenting his defensive theories that he did not cause Holder's injury and that Holder lied about the events in question and about the prior assaults. In addition, the State did not mention in its opening statement during the guilt-or-innocence phase that there was a history of domestic violence or that a witness would be testifying regarding the dynamics of domestic violence. Further, the State only briefly mentioned Tomanetz's testimony in its closing arguments when discussing why Holder may have continued to communicate with Runels after his arrest. Plus, no mention of Tomanetz's testimony was made during the punishment phase of the trial.

In light of the preceding, we believe that even if the district court erred by allowing Tomanetz to testify, the error did not affect Runels's substantial rights and, accordingly, did not result in harm warranting a reversal of Runels's conviction. *See Sonnenberg v. State*, No. 03-14-00530-CR, 2016 WL 3475200, at *3 (Tex. App.—Austin June 16, 2016, no pet.) (mem. op., not designated for publication) (concluding that any error from admission of expert testimony regarding "power-and-control wheel" was harmless where victim testified about assault and injuries and where photographs of victim's injuries were admitted into evidence).

For all the reasons previously given, we overrule Runels's first issue on appeal.

19

**Self-Defense Instruction**

In his second issue on appeal, Runels contends that the district court erred by failing to grant his request for a self-defense instruction in the jury charge.

When reviewing an alleged jury-charge error, appellate courts first determine whether error exists and then, if so, ascertain whether the resulting harm is sufficient to warrant a reversal. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If the defendant made a timely objection, reversal is required if there has been "*some* harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). However, if no objection was made, a reversal is warranted only if the error resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

During trial, Runels requested but was denied an instruction on self-defense. "Self-defense is a justification for otherwise unlawful conduct." *Torres v. State*, 7 S.W.3d 712, 714 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Under the Penal Code, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code § 9.31(a). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

When determining whether a defensive instruction should have been provided, appellate courts "view the evidence in the light most favorable to the defendant's requested"

instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). In general, a defendant is entitled to a jury instruction on a defensive issue if the defensive issue "is raised by the evidence, regardless of the strength or credibility of that evidence." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013). However, an instruction "is not required" if the evidence "does not establish the defense." *Williams v. State*, Nos. 03-14-00228—00229-CR, 2016 WL 370019, at *4 (Tex. App.—Austin Jan. 27, 2016, no pet.) (mem. op., not designated for publication). "A defendant's testimony alone may be enough to require a self defense instruction, but a defendant does not have to testify in order to raise the issue of self defense." *Maxwell v. State*, No. 03-06-00473-CR, 2007 WL 2274883, at *2 (Tex. App.—Austin Aug. 6, 2007, pet. struck) (mem. op., not designated for publication). "A trial court errs in denying a self defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

"In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* "[W]hen the defensive evidence merely negates the necessary culpable mental state, it will not suffice to entitle the defendant to a defensive instruction." *Id.* at 659. "Rather, a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Id.*; *see also Juarez v. State*, 308 S.W.3d

21

398, 404 (Tex. Crim. App. 2010) (explaining that doctrine of confession and avoidance "requires an admission to the conduct, which includes both the act or omission and the requisite mental state"). However, "[a]dmitting to the conduct does not necessarily mean admitting to every element of the offense." *Gamino*, 537 S.W.3d at 512. "For example, a defendant" can essentially admit to committing murder but still deny "an intent to kill." *Id.*

When asserting that a self-defense instruction should have been given, Runels acknowledges that he did not testify at trial and, therefore, did not admit to any misconduct. However, Runels contends that the testimony from Martinez was sufficient to raise the issue of self-defense. As set out above, in a portion of his testimony, Martinez agreed that Holder told him that she was the one who pulled the knife out first, that Runels grabbed the knife from her, and that she cut herself when she grabbed the knife to get it back.

As support for his assertion that Martinez's testimony was enough to warrant a self-defense instruction, Runels primarily relies on *Holloman v. State*, 948 S.W.2d 349 (Tex. App.—Amarillo 1997, no pet.). In that case, the defendant testified that he was arguing with his wife, that he "attempted to leave the house," that his wife "picked up a butcher's knife," that he "feared that he would 'get killed'" because of his wife's "propensity for violence" against him and others, that his wife put the knife down, that his wife grabbed his shirt, that his wife hit him with her hands, and that the two "'tussled' for approximately ten minutes during which time [the defendant] repeatedly tried to free himself" before ultimately being able to leave. *Id.* at 351. In light of this testimony, our sister court of appeals determined that an instruction should have been given because the testimony indicated, among other things, that the defendant's wife "was the first to use force,"

22

that the defendant "feared for his safety," and that the defendant "met force with force." *See id.* Moreover, our sister court explained that although the defendant did not admit to hitting his wife, his testimony included statements that "they 'tussled,'" "that he may have hit her with his legs," and that "he 'fought'" with her. *See id.* at 352. In light of the record supporting a determination that the defendant conceded to hitting his wife and thereby to causing her bodily injury, our sister court explained that the evidence demonstrated that the defendant used "force" to repel the attack of another as described by the Penal Code. *See id.* (citing Tex. Penal Code § 9.31(a)).

In contrast, in this case, the portion of Martinez's testimony relied on by Runels, even when viewed in the light most favorable to the requested instruction, does not support a determination that Runels caused bodily injury to Holder when using force to repel an attack by her. Martinez's testimony indicates that Holder was not injured as a result of any force applied by Runels and was instead injured when she grabbed the knife. Similarly, nothing in the testimony from the other witnesses supports a determination that Holder was injured because Runels was attempting to protect himself from Holder's use or attempted use of unlawful force. *See* Tex. Penal Code § 9.31(a). In her testimony, Holder explained that her hand was injured when she held her hands up to protect herself from Runels who was moving the knife toward her neck, and the testimony from Perry, Stone, and Dr. Casey was consistent with Holder's testimony. Moreover, although Officer Cruz related that Holder initially stated that she was at fault, Officer Cruz elaborated that Holder

23

explained that she was injured either because she grabbed the blade in an attempt to protect herself

or because Runels stabbed her in the hand when she tried to stop the blade.[3]

---

[3] On appeal, Runels refers to other appellate decisions that he suggests support a determination that he was entitled to a self-defense instruction. However, unlike in this case, testimony was presented in those cases that the defendants engaged in some type of conduct, even if it was not the precise charged conduct, that resulted in force being applied to the victim. *See, e.g.*, *Alonzo v. State*, 353 S.W.3d 778, 779, 783 (Tex. Crim. App. 2011) (determining that testimony from defendant that victim "attacked him with . . . a metal object, that the two engaged in a struggle," that victim grabbed metal spike, that victim attacked defendant with spike, that they struggled for control of spike, and that next thing defendant knew was that victim had "a hole in his chest" that "must have happened during the struggle" when they "were so close fighting" was sufficient "to raise the issue of self-defense"); *Juarez v. State*, 308 S.W.3d 398, 405 (Tex. Crim. App. 2010) (concluding that defendant "was entitled to a necessity instruction" where defendant "admitted that he bit" police officer "to get [police officer] off of him because" police officer was suffocating him); *Hubbard v. State*, 133 S.W.3d 797, 800, 802-03 (Tex. App.—Texarkana 2004, pet. ref'd) (determining that defendant was entitled to instruction on defense of necessity, in part, because defendant testified that victim jumped on and tried to rape defendant and that defendant struggled with, tackled, and hit victim repeatedly); *Kemph v. State*, 12 S.W.3d 530, 532-33 (Tex. App.—San Antonio 1999, pet. ref'd) (deciding that trial court erred by failing to include self-defense instruction even though defendant denied charged allegations of biting and kicking officers because testimony at trial indicated that police officers slammed defendant to sidewalk, that officers choked defendant, and that defendant "was struggling against the officers in order to get his face off the ground"); *Torres v. State*, 7 S.W.3d 712, 716 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (determining that defendant raised issue of self-defense even though he denied "intentionally and knowingly causing bodily injury to" his wife because he admitted "to grabbing his wife by her hair, possibly hitting her in the face . . . , struggling with her, and pushing her away"); *Withers v. State*, 994 S.W.2d 742, 744, 745-46 (Tex. App.—Corpus Christi 1999, pet. ref'd) (concluding that defendant was entitled to self-defense instruction and noting that defendant "denied the indicted conduct" but also testified that victim "grabbed her blouse and scarf . . . to choke her" and that she grabbed victim's wrists, "employed a technique she had been taught in her special education training" to stop victim from choking her, and applied "a minimal force on [victim's] back to keep him still"); *see also Foster v. State*, No. 03-17-00669-CR, 2018 WL 3543482, at *5, *6 (Tex. App.—Austin July 24, 2018, no pet. h.) (mem. op., not designated for publication) (deciding that trial court erred by failing to include instruction on self-defense where defendant testified that victim stabbed him, that they struggled for possession of knife and that his actions resulted in victim being injured during their struggle for knife).

In light of the preceding, we cannot conclude that Runels was entitled to an instruction on self-defense. *Cf. Vanright v. State*, 454 S.W.2d 406, 409 (Tex. Crim. App. 1970) (determining that trial court did not err in failing to provide instruction on self-defense where defense presented at trial was that victim was accidentally shot); *Carsner v. State*, No. 08-11-00326-CR, 2018 WL 2998194, at *12 (Tex. App.—El Paso June 15, 2018, pet. filed) (not designated for publication) (explaining that because defendant's "own testimony indicated that the shooting was accidental in nature," she was not "entitled to an instruction on self-defense").

For these reasons, we overrule Runels's second issue on appeal.

**Clerical Error**

In its brief, the State asserts that there is a clerical error in the district court's judgment that requires correction. As set out above, the State alleged that Runels had committed two prior felony offenses. Specifically, the State alleged that Runels previously committed the sequential offenses of robbery and burglary of a vehicle. At the start of the punishment phase, Runels pleaded "not true" to the allegations, but the jury found the allegations to be "true" when assessing Runels's punishment. Although the district court's judgment correctly states that Runels entered a plea of "not true" regarding the robbery enhancement and that the jury found the allegation to be "true," the judgment states "N/A" regarding Runels's plea and regarding the jury's finding pertaining to the burglary enhancement. For these reasons, the State asserts that the district court's judgment should be modified to correctly show Runels's plea and the jury's finding.

This Court has the authority to modify incorrect judgments when it has the information necessary to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28

25

(Tex. Crim. App. 1993). Accordingly, we modify the district court's judgment of conviction to reflect that Runels entered a plea of "not true" to the second enhancement allegation (burglary of a vehicle) and that the jury found the allegation to be "true."

## CONCLUSION

Having modified the district court's judgment to reflect Runels's plea and the jury's finding pertaining to the second enhancement allegation and having overruled Runels's two issues on appeal, we affirm the district court's judgment of conviction as modified.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Modified and, as Modified, Affirmed

Filed:   December 6, 2018

Do Not Publish