*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★ ★ ★ ★

# OPINION

No. 04-08-00771-CR

Brian Pak **CYR**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR5916A
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   December 16, 2009

AFFIRMED

Brian Pak Cyr was found guilty of murdering Corey Baxter and was sentenced to imprisonment for ninety-nine years and a $10,000 fine. On appeal, Cyr argues that (1) he suffered egregious harm from the trial court's failure to instruct the jury that the witness Dane Batterton was an accomplice as a matter of law; (2) the trial court erred in denying his request for juror information; and (3) the trial court erred in failing to hold a hearing on his motion for new trial. We affirm.

**BACKGROUND**

In the early morning hours of March 5, 2007, Corey Baxter was brought to the garage of a house on Chelmsford Street in San Antonio, Texas. He was then severely beaten by several different individuals. He was hit over the head with a baseball bat and a brick, which caused him to suffer severe head injuries. Baxter was hog-tied and wrapped in a rug and blanket. Dane Batterton, who had been beaten in the same garage earlier after being accused by Cyr and others of stealing from a woman, was then called into the garage from the house, handed a gun, and told to shoot Baxter in the head. Batterton picked up the gun and shot Baxter. Batterton testified that he did so only because he was afraid that he would "end up in the same spot Corey's in." Batterton then handed the gun back and left the garage.

One of the individuals in the garage recorded video images and photos on a cell phone that Batterton later identified as one he had given Cyr. The video clips each last about fifteen seconds. The first one shows Baxter walking into the garage, surrounded by several people, and then being hit in the face, causing blood to run down his cheek. One video clip shows a man standing behind Baxter, holding something similar to a baseball bat. The man appears to be about to swing the bat toward Baxter. Another video clip shows Baxter lying on the garage floor, bloodied, and with severe injuries to his head. Yet another video clip shows individuals hog-tying Baxter and wrapping him in a rug. Still another video clip shows a blanket shoved in Baxter's mouth as "duck" tape is being wrapped around Baxter's head and blanket. Cyr's voice can be heard on the video clips.

Clifford Vansycke, an accomplice witness, testified that he was frequently called by Cyr and others to help them "discipline" certain individuals and considered himself, at 6' 4" and 330 lbs., to be "the unofficial enforcer of the group." On the day of the murder, Vansycke was using crystal

methamphetamines with Rudy Hettler, Bobby Cruz, Terry Adams, and a few others. According to Vansycke, Adams told him that Corey Baxter "had confided in him [Adams] that he [Baxter] was hired by . . . Rudy Hettler to take out Bobby Cruz."[1] About forty-five minutes later, Vansycke saw Adams talking with both Hettler and Cruz. According to Vansycke, Adams was "telling them the story." Vansycke testified that both Hettler and Cruz were upset:

> We're all a group of friends. We all hung out together. We all did dope together. We all did a lot of things together. But all of a sudden now one guy is claiming that he's supposedly – you know, supposedly some – one person is supposed to be taking out another person. That's just not what happens with friends. That's not supposed to happen with friends.

According to Vansycke, "[t]here was talk about – about disciplining [Baxter]." When Vansycke, Hettler, and another man named Justin Berban got to the house on Chelmsford, Corey Baxter and Lupe Villarreal were standing at the front door of the house. John Boyer opened the door, and everyone went straight to the garage because "[t]hat's where we always hung out." On his way to the garage, he noticed Batterton in the living room. According to Vansycke, Batterton looked like he had been beaten: one of his eyes and his cheeks were swollen.

Cruz, Michael Yaws, and Yaws's girlfriend Michelle were already in the garage. Cyr then came in with a large group of people. Vansycke testified that at that point, he thought that they were going to "discipline" Baxter and that he was going to be the person to do it:

> Well, I started circling around. I guess it's right at the point I was getting ready to start hitting on [Baxter] . . . when the door opened up and in walked [Cyr] and everybody else. That's when the whole group showed up. And at that point, that's when I decided I didn't need to have anything to do with this. I went ahead – you know, I had taken my jacket off, taken my shirt off. I was in a tank top. I was – like to – getting ready to beat on him. When everybody walked in, I was like, no, no. This ain't me. I'm not going to do anything. I'm not going to touch this dude. . . I've been

---

[1] Vansycke also testified that Cruz was upset with Baxter because he believed Baxter was the reason his little brother had been beaten by some other gang members.

around. I've seen what happens when groups get into a frenzy. . . . And I didn't feel that was necessary. I mean, one person beating up on a guy . . . I mean, he wasn't a very big guy. That's one thing. But a whole group beating up on him? Wasn't needed.

According to Vansycke, the first person he saw hit Baxter was Villarreal. Villarreal hit Baxter on his right cheek. As Vansycke was putting his shirt back on, he saw "Bobby Cruz pick up a baseball bat." Vansycke heard the hit and turned to see Baxter on the ground. "It sounded kind of like a golfball being struck." According to Vansycke, Baxter was looking at him with his eyes "glazed over" - "the lights were on but no one was home."

From the video clips, Vansycke identified Cyr as the person with black clothing, yellow shirt, and white shoes. Vansycke testified that a voice heard on the video clips belonged to Cyr. According to Vansycke, on the video clips, Cyr made the following audible statements: "You're a bitch, bro"; "It's not between you and him"; "Tony Montana, say hello to my little friend"; and "Hey, look at me, bitch. We spit on our enemies." Vansycke also testified that a still from one of the video clips depicts Cyr's hands in latex gloves holding a rope.

According to Vansycke, when Michael Yaws started hog-tying Baxter, he and Hettler left. Vansycke also testified that one of the video clips shows Cyr with his left foot on Baxter's head as Yaws is tying Baxter up.

Vansycke testified that a few hours after he and Hettler had left the house on Chelmsford, they returned because they had Justin Berban's truck and Berban had called saying he was hungry. Vansycke went into the garage and gave Berban a hamburger. When he went into the garage, Vansycke noticed that Baxter had been moved from right by the door leading to the house to the big garage door. According to Vansycke, Baxter was on a "carpet or tarp or something" and looked

significantly worse, but was still alive. Besides the bat, Vansycke thought that a brick in the garage had been used on Baxter:

> I had been asked to hold another video – a little video recorder. And on it, it showed Michael Yaws throwing that brick. Winding up and then throwing it directly at his face. And [Baxter] was already on the ground. I mean, he was tied up. There was no way he could come close to defending himself.

According to Vansycke, Hettler asked him to hold on to the recording "as insurance" for a little while. He then left with Hettler, Berban, and Cruz.

Baxter's body, still hog-tied and wrapped in rugs, was later discovered in a lot next door to a fruit stand. Cyr, along with many others, was indicted for Baxter's murder. Cyr was confined in jail pending his trial, and his former cellmate, Billy Schaef, testified at trial. According to Schaef, Cyr told him about Baxter's murder. Cyr said that Hettler used a blow torch on Baxter; Cruz used a baseball bat; and Batterton shot Baxter. Cyr said that he made Batterton shoot Baxter:

> [Cyr] said that he went and got the gun from Bobby [Cruz]. He gave [Cruz] a hug. He pulled the gun out of [Cruz's] pocket. [Cruz] didn't know [Cyr] got the gun, but [Cyr] pulled the gun out of [Cruz's] pocket. [Cyr] said he went back into the garage, pulled out his gun, put that gun on the thing and told Dane [Batterton], "You shoot him. And if you don't shoot him, you're not leaving this garage." Dane [Batterton] picked up the gun, shot [Baxter], put the gun down and said, "Can I go?"

Schaef testified that the gun Batterton used was later found on Cruz and that Cruz did not know his gun had been used to shoot Baxter.

At trial, the medical examiner testified that Baxter died as a result of a blunt-force injury to his head and neck, and a gunshot wound to his head. According to the medical examiner, she could not distinguish whether it was the blunt-force injury or the bullet wound that caused Baxter's brain injury. The medical examiner testified that a gunshot wound to the brain is usually bloodier than

Baxter's was, which indicated that Baxter had very low blood pressure and had maybe even been in physiologic shock before he was shot.

At trial, Cyr was found guilty of murder. He now appeals.

### ACCOMPLICE AS A MATTER OF FACT OR AS A MATTER OF LAW?

Cyr argues that the trial court erred in failing to instruct the jury that Dane Batterton was an accomplice as a matter of law. With respect to Batterton, the trial court instructed the jury that it should determine whether Batterton was an accomplice:

> Now, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Dane Batterton, was an accomplice, or you have a reasonable doubt whether he was an accomplice, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of Dane Batterton unless you first believe that the portion of the testimony of Dane Batterton [that] ascribes guilt to the defendant is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant unless you further believe that there is other evidence in the case, outside of the evidence of Dane Batterton, tending to connect the defendant with the commission of the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

Because Cyr failed to object to the charge, to be entitled to reversal of the judgment, Cyr must show that an erroneous charge resulted in egregious harm. *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App.), *cert. denied*, 128 S. Ct. 627 (2007).

"One who participates with the defendant before, during or after commission of the crime for which the defendant is on trial is *an accomplice as a matter of fact*." *Ex parte Zepeda*, 819 S.W.2d 874, 875-76 (Tex. Crim. App. 1991) (emphasis added); *see Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) ("An accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental stated."), *cert. denied*, 549 U.S. 1287 (2007). One who is indicted for the same offense with which

the defendant is charged, or indicted for a lesser-included offense based upon alleged participation in commission of the greater offense, is *an accomplice as a matter of law*. *Id.* at 876. A witness is also *an accomplice as a matter of law* when the evidence is uncontradicted or so one-sided that a reasonable juror could not disagree with the determination that the witness is an accomplice. *See Silba v. State*, 161 Tex. Crim. 135, 136, 275 S.W.2d 108, 109 (1954) (explaining that (1) if all the evidence shows that the witness is answerable to the law as a principal or accomplice to the crime or if he has been indicted as such, then he is an accomplice witness as a matter of law; (2) if there is a conflict in the evidence, then the question of whether the witness is an accomplice should be submitted to the jury; and (3) if there is not sufficient evidence to support a charge against the witness as either a principal or accomplice, then he is not an accomplice witness). Thus, when the evidence *clearly shows* that the witness is an accomplice witness *as a matter of law*, the trial court has a duty to so instruct the jury. *See Druery*, 225 S.W.3d at 498. However, if the evidence presented by the parties is conflicting and there is doubt about whether a witness is an accomplice, the trial court has no duty to instruct the jury that a witness is an accomplice witness as a matter of law. *See id.* Instead, the trial court "should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Id.* at 498-99. And, if there is doubt about "whether a witness is an accomplice witness, the trial court may submit the issue to the jury even though the evidence weighs in favor of the conclusion that the witness is an accomplice as a matter of law." *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986).

We cannot say from the record before us that the evidence without doubt shows that Batterton was an accomplice witness as a matter of law or that the jury was unreasonable in

concluding that Batterton was not an accomplice witness. *See Arney v. State*, 580 S.W.2d 836, 839 (Tex. Crim. App. 1979) (holding that the trial court did not err because the evidence did not show without doubt that the witness was an accomplice witness as a matter of law or that jury was unreasonable in concluding that witness was not an accomplice), *abrogated in part on other grounds by Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998); *Gallardo v. State*, 281 S.W.3d 462, 470 (Tex. App.—San Antonio 2007, no pet.) (holding (1) because the witness was not charged and the evidence did not *clearly show* that she could have been indicted for the same offense, she was not an accomplice as a matter of law, and (2) the trial court properly instructed the jury to decide whether the witness was an accomplice witness because although there was some evidence the witness may have committed an act that promoted the commission of one of the offenses, a reasonable jury could have found that the witness did not participate in, solicit, encourage, direct, or aid in the commission of the offenses, or did not do so with the required intent). First, Batterton was not charged with murder or any lesser-included offense. Second, although Batterton admitted that he shot Corey Baxter in the head, he claimed that he did so because he feared for his own safety and that of his family.[2] When a witness claims his complicity in a crime was due to coercion or duress, a factual question is presented for the jury regarding whether the witness is an accomplice. *See Marlo v. State*, 720 S.W.2d 496, 500 (Tex. Crim. App. 1986) ("[I]f a State's witness implicates himself, his statement that his participation was compulsory raises the issue of fact as to whether his testimony is or is not that of an accomplice witness.") (quoting *Easter v. State*, 536 S.W.2d 223, 226 (Tex. Crim. App. 1976)); *State v. Trevino*, 930 S.W.2d 713, 715 (Tex. App.—Corpus Christi 1996,

---

[2] Pursuant to section 8.05 of the Texas Penal Code, an actor who commits a criminal offense under duress has an affirmative defense to prosecution. *See* TEX. PENAL CODE ANN. § 8.05(a) (Vernon 2003). One acts under duress if he "engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." *Id.*

pet. ref'd) (recognizing that "while it is true that a witness who claims his complicity in a crime was due to coercion or duress is not necessarily an accomplice," coercion or duress did not apply to the facts of the case because coercion or duress must include "force or threat of force"); *Alexander v. State*, No. 01-98-00506-CR, 1999 WL 977815, at *4 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (holding that the trial court did not err in failing to instruct the jury that the witness was an accomplice as a matter of law because whether a witness "acted under duress, and therefore whether he was an accomplice, was a fact question") (not designated for publication).

Here, Batterton testified that on March 4, 2007, he was twenty-five years old and had been using methamphetamine since he was fifteen years old. He had been living with an older woman named Jean Ball and other people who also used methamphetamine. According to Batterton, "[i]t was kind of like an open door type of thing." Batterton testified that on the morning of March 4, 2007, Jean's laptop, $800 in cash, and a couple of digital cameras were missing, which made Jean upset and caused her to spend a couple of hours looking for them. Batterton had to leave to pick up his daughter, but he told Jean before he left that he did not take anything and asked her not to believe he had because he was leaving. Late that night at about 2:00 a.m., Batterton was at a friend's apartment sitting on the couch after smoking marijuana when he heard a knock on the door. His friend answered the door and then told Batterton some people where there for him. Batterton testified that Cyr, John Boyer, and J.C. were at the door and began asking him about Jean's missing computer, cash, and cameras. Cyr wanted to know where Jean's belongings were and told Batterton that he had "stole from the wrong lady." Cyr, Boyer, and J.C. took Batterton to the house on Chelmsford and escorted Batterton into the garage. Telling Batterton that he was a bad guy and had stolen from a crippled old lady, the men, who had now been joined by Lupe Villarreal, began beating

Batterton with their fists and kicking his head. Michael Yaws then came into the garage with another man. Cyr told Yaws that Batterton had stolen from a little old lady. According to Batterton, Yaws "is carrying like some kind of – at one point he brought some kind of like metal pole inside a wooden stick." "Sometime shortly after that, guns start to appear," and "[t]hings are starting to get a little more intense." Somebody raised Batterton's arm above his head so Yaws "could take a few good shots at [his] rib cage." Batterton was then "hit over the back of the head with something [he didn't] think was a fist, but [he] didn't see it coming and [he] hit the floor." Bobby Cruz appeared at one point and took turns with someone else hitting Batterton. When Batterton was lying on the floor, Yaws's girlfriend said, "He doesn't look like he's going to take much more of this." "[T]hat's when they decided to tie [Batterton's] hands behind [his] back, feet tied together, and then tie those together . . . hog-tied." Batterton testified that Cyr then put a gun to his head and threatened him:

> It was – the thing that came out of it was – well, since – because I don't have the computer, and I don't have the money, and I don't have the cameras, and they had to put in work to come get me and beat me up and do all this stuff, that I owe each one of those guys [who were] there $500, plus the money for the computer, which is about a thousand dollars. And it came to a total of $5,000.

Cyr told Batterton that if he did not come up with $5,000 in twenty-four hours, he "was dead."

John Boyer then took Batterton upstairs to clean up and take a shower. Batterton's shirt and jeans had his blood all over them, so they took his clothes and gave him some clean clothes. They then put Batterton on the couch downstairs, telling him to start working on coming up with $5,000. Batterton thought about escaping, but decided not to because he did not know the area very well, it was the middle of the night, he had no money and no phone, and even if he ran out of the home, he did not have a ride. Batterton testified, "I don't have any way to get out of that part of town, and I'm going to be found and it's going to be even worse." Further, according to Batterton, he was also in

and out of consciousness from his head injuries. After sleeping for about three hours, he called his daughter's mother who said she would try to find him some money. Batterton called his father who said he would not help. Yaws then took Batterton to a grocery store and told him to fraudulently cash a money order:

> [T]he people just looked at me at the customer service center at [the grocery store] like I was an idiot. I'm beat up and bruised, and with an I.D. that's not mine – you can tell it's not me – trying to cash a money order. So, that's not working at all.

Batterton then remembered that a friend owed him money, so Cyr took Batterton to the friend's house. The friend gave Batterton a phone with six months or a year's worth of service on it. Batterton asked Cyr if he would take the phone in lieu of some of the money owed. Cyr said that he would deduct $500 from the total amount owed. This phone was the one that was found by police and contained images of Baxter being beaten.

Cyr then took Batterton to a hotel room where Bobby Cruz asked him how he was going to get the rest of the money. Batterton eventually ended up back on the couch at the Chelmsford house in the early evening hours of March 5, 2007. Cyr, Villarreal, Hettler, John Boyer, Yaws, and Yaws's girlfriend were in the garage. At some point, Batterton saw Baxter and Cruz come into the house and head straight for the garage. Batterton testified that he was the only one in the house, but every once in a while someone would come in from the garage to see what he was doing. Batterton then fell asleep on the couch. When he awoke, he wanted a cigarette and walked towards the garage door. As he was getting close to the door, it opened and Villarreal came in and told him that he could not go into the garage. Batterton heard raised voices coming from the garage. He asked Villarreal if he could have a cigarette. Villarreal went back into the garage and got Batterton a cigarette. Batterton then smoked a couple of cigarettes on the back porch and went back to sleep on the couch.

Batterton testified that he did not leave the house because even though someone was not "keeping a direct eye on [him] at that point," he was completely out of options. He did not want to bring any more harm to anyone else and did not want his family involved: "At this point, I've already involved my mom, my dad, my daughter, my daughter's mom, and I didn't want it to go any further."

Batterton was awakened by Villarreal who told him to come into the garage. According to Batterton, when he stepped into the garage, he saw blood everywhere and Baxter lying on the ground being rolled into a carpet by Villarreal and Yaws. Batterton testified that he could hardly recognize Baxter because there was blood all over his beaten face. Baxter was not talking, but was making gurgling sounds like he could barely breathe. Cyr, with a gun on his lap, was sitting on a bench seat that had been removed from a Suburban or van and was giving directions, "like he was the boss telling his employees what to do." Batterton testified that Cyr then told Yaws to give the gun to Batterton because Batterton was going to shoot Baxter. Batterton thought to himself, "I better do it or I'm – I'm not going to make it out of this garage." Villarreal was "holding the carpet up at an angle and like squeezing around where [Baxter]'s head [was] . . . to get him to stop making those noises." Yaws pointed to a box of gloves and told Batterton to put one on in case blood sprayed out. Batterton put on one of the latex gloves, but Cyr told him to take the glove off because he wanted Batterton "to feel it." Yaws had the gun in his hand and told Batterton to come over there. Yaws put one bullet in the chamber. Batterton grabbed the gun and stuck his hand "towards the opening of the carpet where [he] assumed [Baxter]'s head was." Yaws then grabbed his hand and pushed it further down. Batterton then pulled the trigger, and the gun fired. Batterton turned around, and Cyr had this "grin on his face – kind of looked like, 'Well, how did that make you feel? Did that – did it feel good?'"

> And I sure wasn't going to say, "Oh, no, it felt horrible." Because I'm thinking if I'm going against what's happening in this garage, I'm going to end up in the same spot he's in, [Baxter]'s in. So rather than say anything, I just kind of shrugged. You know, like it wasn't anything to me. That's not how I felt.

Batterton testified that he shot Baxter because he "didn't want to end up next to him in the same position." Batterton later helped Cyr, Villarreal, and Yaws load Baxter's body into the Suburban. Cyr, Villarreal, and Yaws discussed where to leave the body, and Cyr said, "I've got a spot." They then left, and someone stayed to watch Batterton. After about ten minutes, Cyr, Yaws, and Villarreal returned to the house:

> At that point, the sun is starting – it's real early in the morning. . . . Nobody has money for gas; nobody has money for drugs; nobody has money for anything. So the day's going to be, again, about me getting this money. And [I] went to [a store] once, I think, to try to cash one of them money orders. Just anything to get the money is basically what [I] was being told. You know, scam [the store], cash a bad money order, whatever the case may be, till that evening.

Then, according to Batterton, they took him to a shopping center where they said that someone was going to meet them. Batterton's friend, Travis, and another man, Dan, met them at the shopping center. Batterton testified that Dan was the one who had stolen the computer. Yaws and Villarreal went with Dan to get Jean Ball's computer. Cyr, J.C., and Batterton returned to the house to wait:

> And at that point . . . I'm off the hook because they figured out that Jean had just kind of revved up their engine and got them going, thinking I stole something that I didn't steal. So now their – their view of it now is that I don't owe them money; Jean should pay them because Jean had them go do some stuff that they didn't really have to do.

Everyone then went to Jean Ball's house to give her the computer back. Cyr and Yaws told Jean that she owed them money for their trouble. Afterwards, Cyr and Yaws apologized to Batterton for beating him up and asked him if he wanted to "hang out." Batterton had talked to his daughter's mother, who had told him that she would pay for a bus ticket for him to come to Houston. His

daughter's grandmother, who lived in San Antonio, then picked him up and drove him to the bus station.

Under Batterton's version of events, he shot Baxter under duress. He had been beaten, hog-tied, and told, with a gun to his head, that if he did not come up with $5,000 within twenty-four hours he would be killed. He then saw Baxter come into the same house and go into the same garage where Batterton had been beaten earlier. Later when Batterton was called into the garage, Baxter was lying on the floor and being rolled into a carpet. He was bloodied, also hog-tied, and was making gurgling sounds. Cyr then ordered Batterton to shoot Baxter. Batterton testified that he shot Baxter because Cyr would have killed him if he did not do so. Whether Batterton acted under duress, as he testified, or whether he was an accomplice, was a fact question for the jury. Hence, the trial court did not err in failing to instruct the jury that Batterton was an accomplice as a matter of law.

### JUROR INFORMATION CARDS AND MOTION FOR NEW TRIAL HEARING

In two separate issues, Cyr argues that the trial court erred in denying his request to review juror information cards and in denying his motion for new trial without conducting a hearing. We disagree.

After the trial, Cyr filed a motion for new trial and a motion to view juror information. Attached to Cyr's motion for new trial was his counsel's affidavit in which his counsel affirmed the following:

> I was informed that one of the jurors in this case approached the media and alleged that she "was not comfortable with her verdict." I confirmed the information with a representative of the media who substantiated that the information was true. Additionally, I was informed that the juror believed that the defendant was not guilty but later changed her verdict during jury deliberations for an unknown reason. A hearing is necessary to determine if that individual juror's verdict was changed for any reason contrary to the instructions of this Court or law. Such a verdict would therefore not be a fair expression of that juror's opinion.

Emphasizing the information contained within his counsel's affidavit, Cyr argued in his motion for new trial that the jury's verdict was decided in a manner other than a fair expression of a juror's opinion. In his request to view juror information, Cyr argued that he needed the juror information cards "to fully identify the juror and confer with the juror, if she is willing to communicate with counsel." According to Cyr, "[t]he communication with the jury is necessary for counsel to determine if any reversible error occurred and if a new trial may be necessary." The trial court denied both motions without holding a hearing.

Article 35.29 of the Texas Code of Criminal Procedure prohibits personal information about jurors from being disclosed after trial unless good cause is shown. *See* TEX. CODE CRIM. PROC. ANN. art. 35.29 (Vernon Supp. 2009). "On a showing of good cause, the court shall permit disclosure of the information sought." *Id.* Here, Cyr failed to show good cause. In his request for disclosure, Cyr argued that a juror had told a member of the media that she "was not comfortable with her verdict," and that the member of the media had been able to identify the juror only as "Lisa." Thus, Cyr argued the "information contained on the juror's information cards tendered to counsel at the time of voir dire is necessary for counsel to fully identify the juror and confer with the juror, if she is willing to communicate with counsel." Such allegations, however, are not sufficient to show good cause.

What constitutes good cause must be based upon more than a mere possibility that jury misconduct might have occurred; it must have a firm foundation. *Esparza v. State*, 31 S.W.3d 338, 340 (Tex. App.—San Antonio 2000, no pet.). That a juror was "uncomfortable" with her verdict does not constitute a firm foundation that jury misconduct occurred. *See Castellano v. State*, No. 04-06-00524-CR, 2007 WL 2935399, at *3 (Tex. App.—San Antonio 2007, no pet.) (holding that defendant had "reason to believe" juror misconduct had occurred was not sufficient to show good

cause); *Garza v. State*, No. 04-02-00599-CR, 2003 WL 23008845, at \*10 (Tex. App.—San Antonio 2003, pet. ref'd) (holding that testimony of defendant's mother that juror was distant relative of defendant and was prejudiced against him was insufficient to show good cause because mother also admitted that she could not remember juror's first name, did not know how juror was related to defendant, and had no personal knowledge of the juror's feelings toward defendant). Therefore, the trial court did not err in denying Cyr's request for juror information.

Cyr also argues that the trial court erred in denying his motion for new trial without holding a hearing. We review the trial court's denial of a hearing on a motion for new trial for abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009).

The purpose of a hearing on a motion for new trial is to (1) decide whether a cause should be retried and (2) prepare a record for presenting appellate issues if the motion is denied. *Id.* at 338. Such a hearing is not an absolute right and is not required when the matters raised in the motion for new trial are determinable from the record. *Id.* Here, Cyr has alleged juror misconduct, which is a matter not determinable from the record. However, even though Cyr has raised a matter not determinable from the record, because requiring a hearing on all matters not determinable from the record could lead to "fishing expeditions," he would not be entitled to a hearing on his motion for new trial unless he established the existence of "reasonable grounds" showing that he could be entitled to relief. *Id.* at 339.

Because Cyr must show reasonable grounds exist for a new trial, as a prerequisite to a hearing, his motion had to be supported by an affidavit, either of himself or someone else, specifically setting out the factual basis for the claim. *Id.* The affidavit need not establish a *prima*

*facie* case, or even reflect every component legally required to establish the relief requested. *Id.* "It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim." *Id.*

The State argues that the affidavit in support of Cyr's motion for new trial, affirmed by Cyr's counsel, is insufficient because it does not reflect that Cyr's counsel had personal knowledge and was instead based on hearsay. "It is well established that a motion for new trial complaining of jury misconduct must be supported by the affidavit of a juror, or some other person *who was in a position to know the facts*, or must state some reason or excuse for failing to produce the affidavits." *Baldonado v. State*, 745 S.W.2d 491, 493 (Tex. App.—Corpus Christi 1998, pet. ref'd) (emphasis added); *see also Dugard v. State*, 688 S.W.2d 524, 528 (Tex. Crim. App. 1985), *overruled on other grounds by Williams v. State*, 780 S.W.2d 802 (Tex. Crim. App. 1989); *Bearden v. State*, 648 S.W.2d 688, 690 (Tex. Crim. App. 1983). Counsel's affidavit does not reflect that he was in a position to know the facts. Instead, his affidavit affirms that a member of the media told him that a juror had told him that she was "uncomfortable" with the verdict. Thus, the affidavit was deficient, and the trial court did not err in failing to hold a hearing. *See Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994) (holding that because affidavit was conclusory in nature and thus deficient, motion for new trial was not sufficient to put trial court on notice that reasonable grounds existed).

Moreover, even if the affidavit had been sufficient, the trial court still did not err in failing to hold a hearing because the affidavit did not establish the existence of reasonable grounds showing Cyr could be entitled to relief based on jury misconduct. *See Smith*, 286 S.W.3d at 339. To demonstrate jury misconduct, a defendant must show that (1) the misconduct occurred and (2) the misconduct resulted in harm to the movant. *Jennings v. State*, 107 S.W.3d 85, 90 (Tex. App.—San Antonio 2003, no pet.). The affidavit at issue here merely states that a juror "was not comfortable

with her verdict" and that said juror "believed that the defendant was not guilty but later changed her verdict during jury deliberations for an unknown reason." Being uncomfortable with the verdict and changing your vote during jury deliberations for an unknown reason does not establish that reasonable grounds existed for Cyr to be entitled to a new trial based on jury misconduct. Therefore, the trial court did not err in denying Cyr's motion for new trial without holding a hearing.

## CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

PUBLISH