

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00557-CR

Rafael **CASTILLO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CR2162
Honorable Jennifer Peña, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:    Beth Watkins, Justice
Liza A. Rodriguez, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: February 21, 2024

AFFIRMED

Appellant Rafael Castillo challenges his murder conviction on evidentiary, jury instruction,

and sufficiency grounds.[1] We affirm the trial court's judgment.

---

[1] After counsel filed a brief on Castillo's behalf, Castillo filed a pro se brief in which he raised two additional issues. But Castillo does not have a right to hybrid representation. *Scheanette v. State*, 144 S.W.3d 503, 505 n. 2 (Tex. Crim. App. 2004); *see also Landers v. State*, 550 S.W.2d 272, 280 (Tex. Crim. App. 1977) (defining hybrid representation as "representation partially pro se and partially by counsel"). Nor does he have a constitutional right to represent himself on direct appeal. *Scheanette*, 144 S.W.3d at 505 n.2. Thus, we will not address either of Castillo's pro se issues.

## BACKGROUND

Nicole Perry was killed at 338 West Harlan. The address had a front house and a back house, and a number of people cycled in and out of both houses to use methamphetamine. Robert Martinez, who went by the name Gizmo, lived in the back house and was friends with Nicole. Gizmo kept his tools—including a machete and an axe—in one room and lived in the other. In November of 2020, Nicole and her boyfriend, Randall Fulghum, had become homeless. Gizmo allowed them to stay with him and to sleep on the couch in his room. Gizmo's friends Vanessa Vargas and Castillo also stayed in the back house.

The first night Nicole and Fulghum spent at Gizmo's home passed uneventfully. But the following day, Nicole, Fulghum, Gizmo, and Vargas were using drugs. Nicole was being "mean," "rude," "irritating," and "jabbering. . . [saying] stuff that, you know, made no sense to anybody but herself." Castillo told Nicole "that she needed to shut up and just be still for a while." The conflict between them escalated, and Castillo took out a pink camouflage gun. He ultimately bound Nicole's hands with duct tape, laid down a roll of plastic sheeting on the floor, cut off her hands with a machete, swung an axe into her head, and ordered Fulghum and Vargas to clean up. Fulghum and Vargas complied, and they put Nicole's body in two plastic storage tubs.

Days later, Gizmo asked a friend named Steven Cleveland, who had a car, to "get rid of" "a couple of packages or bags of trash." Cleveland testified he backed into Gizmo's driveway and opened the back hatch of his SUV, where two other people loaded trash bags. One of Gizmo's friends got in Cleveland's SUV, and they dumped the bags along W.W. White Road. Cleveland testified he did not know the bags contained a body. When he returned to 338 West Harlan, Gizmo asked him to dispose of a crock pot containing human hands. Cleveland refused, left, and called his attorney. Meanwhile, Bexar County Public Works employees were collecting trash off W.W.

White Road when they discovered several bags of trash along with plastic bags containing a body inside blue plastic tubs; they called the authorities.

Medical examiner Dr. James Feig identified the body recovered on W.W. White Road as Nicole's and testified that her body had been wrapped in plastic and then placed in two blue tubs that were connected with plastic wrap. Nicole's hands had been chopped off—there were four chop wounds to one arm, and three to the other. He identified another chop wound "to the side of the head through the skull." He explained that her feet had been bound with duct tape and a zip tie had been tightly affixed around her neck. He further testified:

> So, again, really this case breaks down to three major findings. There is the chop wound to the head, the hands are amputated and there's a zip tie tightly around the neck, suggestive of strangulation. Either one of those -- or either one of those three could be fatal.

> For this particular case, the problem for me as a pathologist is that I can't tell you which one happened first. And it's also possible she may already have been dead at some point when additional injuries occurred. So, there's a little bit of uncertainty as -- on my end as to which injury is the fatal injury, but it could potentially be any one of them.

Dr. Feig stated, "The typical strangulation is going to have hemorrhage in the soft tissue, and it's going to have plus/minus maybe half the time a fracture." He did not find "provocative evidence" of strangulation, such as internal hemorrhaging or fractures of bones or cartilage in the neck, "which makes the diagnosis harder."

The trash bags found near Nicole's body contained latex gloves, a pizza box with Gizmo's name on it, and a bill of sale for a gun that was sold to Castillo's sister. Homicide investigators executed a search warrant at 338 West Harlan. At the time, approximately ten people were there; they were all interviewed, but none were particularly helpful, and all were released. Officers recovered physical evidence containing Nicole's blood from the back house at 338 West Harlan, including the machete and the axe. In a later round of interviews, witnesses named Castillo as

Nicole's killer and described the machete and the axe as the weapons used. No witness to the crime made any statement on or testified about the zip tie. DNA connected Castillo and Gizmo to a latex glove containing Nicole's blood that was recovered in the trash bags. Additional DNA connected Vargas to work gloves containing Nicole's blood that were recovered from the back house.

The trial court excluded evidence that, in an extraneous assault, Gizmo had used a zip tie as a ligature on a woman's neck. The court gave an accomplice-witness instruction that "a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." The court defined accomplice, and then instructed the jury that "a person is not responsible for an offense committed by another if the person participated in the offense under duress." The court applied these accomplice/duress instructions to Gizmo; it declined Castillo's request for similar instructions for Fulghum and Vargas, and did not issue accomplice/duress instructions for Cleveland. The jury convicted Castillo of murder and assessed punishment at seventy years' confinement. The trial court imposed a sentence consistent with the jury's verdict and Castillo appealed.

**ANALYSIS**

*Exclusion of Evidence*

In his first issue on appeal, Castillo contends the trial court erred in excluding his proffered evidence that, after using methamphetamine one year prior to Nicole's murder, Gizmo had assaulted the mother of his child, Desiree Rios, in part by placing a zip tie around her neck and attempting to tighten it. Castillo argues the evidence was vital to his defense that Gizmo caused Nicole's death with the zip tie. The State responds that the charge against Gizmo from the alleged assault on Desiree Rios was dismissed, and that the trial court properly excluded this evidence

under Texas Rules of Evidence 404(b), 403, and 613 because there was no evidence that Gizmo put the zip tie on Nicole's neck.

*Applicable Law and Standard of Review*

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Rule 404(b) provides that evidence of crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). But it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "Rule 404(b) is a rule of inclusion rather than exclusion." *Id.*

Under Rule 404(b), the State may offer proof of other crimes by the accused "so nearly identical in method [to the charged offense] as to earmark them as the handiwork of the accused." *Owens v. State*, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992) (internal quotation marks omitted); TEX. R. EVID. 404(b). Texas courts have recognized that "the rule should cut both ways and benefit an accused in appropriate circumstances just as it does the State." *Renfro v. State*, 822 S.W.2d 757,

759 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). In the context of proving that another actor committed the charged offense, similar evidence offered by the defendant is sometimes referred to as "reverse 404(b) evidence." *Torres v. State*, 71 S.W.3d 758, 761 n.5 (Tex. Crim. App. 2002). That is, a defendant in a criminal case may offer reverse 404(b) evidence "in the form of other acts by a third person, as proof that this person, rather than the defendant, committed the charged crime." 1 Christopher B. Mueller & Laird C. Kirkpatrick, FEDERAL EVIDENCE § 4:37 (4th ed. 2013).

We review a trial court's exclusion of evidence for an abuse of discretion. *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003). If the trial court rules "within the bounds of reasonable disagreement we will not disturb its ruling." *Id*. If the trial court rules outside those bounds, we apply Rule 44.2(a) if the error is of constitutional dimension, or Rule 44.2(b) if it is not. TEX. R. APP. P. 44.2.

*Application*

At trial, Castillo proffered the evidence, in part, as alternative perpetrator evidence to support his defense that Gizmo caused Nicole's death. "[A] defendant's right to present a complete and meaningful defense at trial" includes the right to present evidence of third-party guilt. *Prible v. State*, 245 S.W.3d 466, 468–69 (Tex. Crim. App. 2008). Such evidence is "admissible if it raises a reasonable inference or presumption as to the defendant's innocence and is limited to facts that are inconsistent with his own guilt, but it is not admissible if it merely casts a bare suspicion upon another or raises a conjectural inference as to the commission of the crime by another." *Id*. at 469. To present such evidence, the defendant must show a "nexus between the crime charged and the alleged 'alternative perpetrator.'" *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002). As discussed above, alternative perpetrator evidence may consist of reverse 404(b) evidence. *See Dickson v. State*, 246 S.W.3d 733, 740–41 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

Castillo argued that in the prior assault, Gizmo was "high on drugs, hallucinating and put[]

a zip tie around the victim's neck and attempt[ed] to -- to tighten it. . . . And the modus operandi

used on Nicole [] is similar -- very similar to the mode in the Desiree Rios' assault case." We agree

that these strangulation by zip tie allegations assert a sufficiently idiosyncratic method to carry out

a crime. *See Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996) (coat hanger

strangulation sufficiently distinctive to be "signature crime" so extraneous strangulation offense

admissible for purpose of proving that defendant, rather than accomplice, committed the crime).

Castillo also articulated the following nexus between Gizmo and the crime charged:

> Nicole Perry is murdered at [Gizmo]'s home, the back house. But that's where he lives. The weapons that were used were [Gizmo]'s. The items that were used to clean up were [Gizmo]'s. And . . . there's been testimony that [Gizmo] was present when the murder happened. Here -- oh, and then also the ME in the case testified to a zip tie around Nicole Perry's neck."

The State lodged a Rule 403-type objection, and the trial court concluded that there was no nexus

between Gizmo and the crime charged, especially in light of Dr. Feig's testimony that the lack of

strangulation injuries meant he could neither rule in nor rule out strangulation as the cause of

Nicole's death. We agree with Castillo that the nexus is Gizmo's presence at the scene of the crime.

*Cf. Wiley*, 74 S.W.3d at 406 (no nexus because nothing tied known fire-starter to specific arson

offense); *Dickson*, 246 S.W.3d at 741 (no nexus because nothing tied known robber to specific

robbery offense). We further conclude there was no danger of confusion of the issues. Rather than

creating a side issue that would serve as an undue distraction, the contested evidence could have

helped the jury decide the questions it was required to answer: whether Castillo inflicted the fatal

blows and whether Gizmo qualified as an accomplice. *Cf. Gigliobianco v. State*, 210 S.W.3d 637,

641–42 (Tex. Crim. App. 2006); *Taylor*, 920 S.W.2d at 322–23. This evidence posed no threat of

undue delay—Castillo's proffer on this topic was brief, with the combined testimony of Gizmo

and Rios spanning less than seven pages of a reporter's record that contained four volumes of

testimony. Similarly, this evidence did not repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42. The erroneously excluded evidence, if believed, would have incrementally furthered Castillo's defensive theory that he did not inflict Nicole's fatal wounds. We conclude that the trial court abused its discretion in excluding the evidence because it was relevant under Rule 401, admissible under Rule 404(b), and not excludable by Rule 403. *See id.*

But not every erroneous exclusion of evidence amounts to a constitutional violation. Such exclusion rises to a constitutional magnitude "only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). Castillo used the complete absence of evidence connecting him to the zip tie, together with Dr. Feig's testimony that the zip tie could have caused fatal strangulation, to argue an alternate perpetrator theory. He argued the chop wounds were inflicted after Nicole had died as a result of being strangled by another actor. And he used the testimony of those present during the crime to suggest that Gizmo was that actor and to obtain an accomplice-witness instruction for Gizmo. As Castillo argued in closing:

- "Disposing of a body is a crime. Tampering with evidence is a crime. Who isn't charged? [Gizmo.]"

- "We heard [Gizmo] was giving orders to people about what to do, but he's not charged."

- "Well, we know [Gizmo] texted Vanessa and talked to Randall . . . there was testimony that [Gizmo] was reaching out to these people after he, again, went back in December and finally came clean. He decided to make sure that Vanessa and Randall were also going to talk to the police."

- "No mention of zip ties. We know that there's pictures on the autopsy of zip ties."

- "[Gizmo] -- the back room -- again, that's his place. He just happened to have zip ties and weapons and tape and cleaning supplies."

Because this exclusion of evidence did not prevent Castillo from presenting his defensive theory, it is not of constitutional dimension. *Id*. at 666. We therefore apply Rule of Appellate Procedure 44.2(b) to determine whether the exclusion caused reversible error. TEX. R. APP. PROC. 44.2(b). Under that rule, error must be disregarded if it does not affect substantial rights.

In making this determination, we "consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence," and, if relevant, "the trial court's instructions to the jury, the theories of the case that the State and defendant have espoused, arguments to the jury and relevant voir dire." *Schutz v. State*, 63 S.W.3d 442, 444–45 (Tex. Crim. App. 2001).

*Testimony and physical evidence*

Testimony showed that Castillo laid down a plastic sheet, chopped off Nicole's hands with a machete and, because she was still moving, drove an axe into her head. Dr. Feig testified to three possible causes of death: chopping off the hands, the axe to the head, and the zip tie tightened around the neck. Police found items with Nicole's body, including the plastic used to wrap her body, latex gloves, a pizza box with Gizmo's name, and a bill of sale that tied the pink camouflage gun to Castillo's sister. The police recovered cleaning supplies, the machete, and the axe at 338 West Harlan. DNA evidence tied Castillo, Gizmo, and Vargas to gloves that also contained Nicole's blood.

*The nature of the evidence supporting the verdict*

The evidence that Castillo murdered Nicole included:

- Gizmo's testimony that when he walked into his room, Nicole was "on the floor with an ax[e] in her head" and Castillo was next to her "cleaning his hands";

- Fulghum's testimony that Castillo taped Nicole's hands and mouth, laid plastic on the floor, struck her with a machete three times, chopping off her

hands, and then, because she would not stop moving, grabbed an axe and "swung it and buried it into her skull";

- Vargas's testimony she witnessed Castillo start to kill Nicole "by cutting her hands off" with a machete and finish by putting an "axe through her skull";

- Maggie Vela's testimony that Castillo used the front house to wash off blood and told her "they didn't think I would do it";

- Vela's testimony about Castillo's multiple explanations for needing to take a shower and having blood on his shoes;

- Castillo's sister's testimony that her pink camouflage gun had been stolen and identifying the bill of sale for the gun found in the trash as the one she kept with the gun;

- Vargas, Espinoza, and Vela's testimony identifying a pink camouflage gun as being in Castillo's possession;

- Vargas's testimony that Castillo threatened her, Fulghum, and Nicole with the gun;

- Cleveland's testimony that "another man" handed Gizmo a crock pot containing Nicole's hands;

- DNA evidence tying Castillo to the crime; and

- Dr. Feig's testimony about Nicole's fatal chop injuries which matched the testimony and weapons found at the scene.

*Character of the error and its relationship to other evidence*

In an offer of proof, Gizmo denied that he hit Desiree Rios or that he put a zip tie around her neck. Rios also gave offer-of-proof testimony. After explaining that she was on probation for "a drug case" and was receiving court-ordered inpatient treatment for "substance abuse and mental health disorders," she testified that Gizmo hit her. Initially, she could not recall if he had used a zip tie, then responded, "I believe so" when asked if he put a zip tie around her neck. After reviewing the police report, she acknowledged that she had told officers that he had put a zip tie

around her neck. Although she ultimately agreed that Gizmo used a zip tie, the jury could have reasonably given her testimony less weight because it was equivocal.

The evidence of strangulation was not definitive. The internal examination of the structures inside Nicole's neck could have—but did not—produce "provocative evidence" of strangulation, such as fractures of cartilage or bones or hemorrhaging within the soft tissue of the neck.

*The trial court's instructions to the jury*

In this case, the trial court's instructions to the jury are not relevant to our consideration of this issue.

*The theories of the case and arguments of counsel*

The State's theory was that only the chopping injuries were fatal, that Castillo alone committed those, and that Castillo then made the others clean the scene. The defense challenged the credibility of all the eyewitnesses due to their inconsistent statements and admitted drug use before, during, and after the crime. And the defense theorized that since Dr. Feig could not say which injury came first, Nicole already could have been dead at the time her hands were severed with a machete and her head was cleaved with an axe.

*Conclusion on exclusion of relevant evidence*

After considering the above factors, we have fair assurance that the exclusion of the reverse 404(b) evidence did not affect Castillo's substantial rights. Both Vargas and Fulghum testified that they saw Castillo kill Nicole with a machete and an axe. Fulghum specifically testified that Castillo used the axe because Nicole would not stop moving, indicating that she was not already dead by the time Castillo used the axe. Had the jurors considered Rios's equivocal testimony, they may have considered it significant, but we cannot say it was conclusive. *See Schutz*, 63 S.W.3d at 446. We overrule therefore Castillo's first issue.

## *Definition of Accomplice Witness*

Castillo next argues the trial court erred in not providing the jury an instruction containing the full definition of accomplice. The accomplice-witness statute does not define the term "accomplice," but definitions abound in case law. *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013). For instance, a witness is an accomplice as a matter of law if: (1) "the witness has been charged with the same offense as the defendant or a lesser-included offense"; (2) the witness, so charged, has charges dismissed "in exchange for the witness's testimony against the defendant"; or (3) the evidence "is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice." *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017). The Court of Criminal Appeals has also explained, "[a]n accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). Furthermore, "a person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a blameworthy participant." *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998).

Here, the jury charge provided: "An accomplice is one who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state. An accomplice is someone whose participation in the crime would permit his or her conviction for the crime charged in the indictment." Castillo argues this definition constituted error because it failed to mention lesser-included offenses. But we interpret the first sentence as broad enough to capture a blameworthy participant who could be charged with a lesser-included offense. *See id.* at 454–55. For that reason, we overrule Castillo's second issue.

- 12 -

***Accomplice-Witness Jury Instruction***

Third, Castillo argues that the trial court erred in failing to give accomplice-witness jury instructions for Vargas, Fulghum, and Cleveland.

*Applicable Law and Standard of Review*

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14. "For accomplice witnesses as a matter of law, the trial court affirmatively instructs the jury that the witness is an accomplice and that his testimony must be corroborated." *Zamora*, 411 S.W.3d at 510. "In contrast, when the evidence presented by the parties as to the witness's complicity is conflicting or inconclusive, then the accomplice-witness instruction asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined that the witness is an accomplice." *Id*. Whether an accomplice-as-a-matter-of-fact instruction must be submitted is to be determined on a case-by-case basis. *Cocke*, 201 S.W.3d at 748.

"[T]he procedural framework of *Almanza* applies to accomplice-witness instructions, both as a matter of law and as a matter of fact[.]" *Zamora*, 411 S.W.3d at 512. The first question in analyzing a jury-charge issue under *Almanza* is whether the charge contains error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the charge contains error in the omission of an accomplice-witness instruction, we analyze that error for harm. *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). "The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection." *Ngo*, 175 S.W.3d at 743. If preserved, error requires reversal if we find some harm. *Id*. If not, error requires reversal if we find egregious harm. *Id*. at 743–44.

*Application*

Castillo requested accomplice-witness and duress instructions for Vargas and Fulghum, but not for Cleveland. We analyze each purported accomplice witness separately.

*Vargas*

Vargas testified that she frequented 338 West Harlan and sometimes stayed there. It "was the hangout spot" where everyone used drugs. She knew Maggie Vela, James Espinoza, and the homeowner Mario, who lived in the front house. In the back house, she knew Gizmo, and had met Castillo because they were both "in and out of" 338 West Harlan as well as another house. Vargas testified she was present the day Nicole died and had gone to the front house to prepare a meal. When she returned to the back house, she saw that Nicole was bound and Castillo started to kill her by cutting off her hands before "[h]e put an axe through her skull." She testified that Castillo told her to help Fulghum clean and said he would kill Vargas and her son if she did not clean the scene. She helped clean the scene and put Nicole's body in the containers. She testified that she did so under duress, at the direction of Castillo and Gizmo. Vargas's work after the fact does not transform her into an accomplice witness. *Druery v. State*, 225 S.W.3d 491, 500 (Tex. Crim. App. 2007).

But some evidence showed that Vargas did more than just help clean the scene after the fact. Vela testified that Vargas had told her, through tears and fear, that Vargas had held the gun to Fulghum's head while "[Castillo] had cut off [Nicole's] hands." Vela said that Vargas "was crying, she was scared" when she recounted this event to Vela, and that it "seemed like she was scared of being charged with something." Similarly, Fulghum testified that Vargas held a knife during the offense. This testimony raises a factual question about whether Vargas was an accomplice or whether she was acting under duress. *Zamora*, 411 S.W.3d at 510. Because the evidence about Vargas's complicity is conflicting or inconclusive, Castillo was entitled to the same

accomplice and duress instructions for Vargas that the trial court gave for Gizmo. *Cyr v. State*, 308 S.W.3d 19, 25 (Tex. App.—San Antonio 2009, no pet.) ("When a witness claims his complicity in a crime was due to coercion or duress, a factual question is presented for the jury regarding whether the witness is an accomplice.").

Since Castillo objected to the trial court's decision not to include an accomplice-witness instruction for Vargas in the charge, we turn to whether there was some harm. *Ngo*, 175 S.W.3d at 743. In this context, that test turns on whether "(1) there is non-accomplice evidence, and (2) there is no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense." *Herron v. State*, 86 S.W.3d 621, 633–34 (Tex. Crim. App. 2002). Error is also harmless under this standard when the corroborating evidence is so strong that "it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense." *Casanova*, 383 S.W.3d at 539–40. "In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime." *Herron*, 86 S.W.3d at 632.

There is no rational and articulable basis to disregard all the non-accomplice evidence or to find that it failed to connect Castillo to the offense. As discussed below, the evidence did not support an accomplice-witness instruction for Fulghum, and Fulghum, like Vargas, testified Castillo killed Nicole by striking her with a machete and an axe. And, as set out above, physical evidence corroborated that account. Specifically, a latex glove found in the trash bags Cleveland dumped on W.W. White Road along with Nicole's body contained Castillo's DNA. Moreover, the jury considered the following non-accomplice evidence:

- Fulghum's testimony that Castillo taped Nicole's hands and mouth, laid plastic on the floor, struck her with a machete three times, chopping off her

hands, and then, because she would not stop moving, grabbed an axe and "swung it and buried it into her skull";

- Vela's testimony that Castillo used the front house to wash off blood and told her "they didn't think I would do it";

- Vela's testimony about Castillo's multiple explanations for needing to take a shower and having blood on his shoes;

- Castillo's sister's testimony that her pink camouflage gun had been stolen and identifying the bill of sale for the gun found in the trash as the one she kept with the gun;

- Espinoza and Vela's testimony identifying a pink camouflage gun as being in Castillo's possession;

- Cleveland's testimony that "another man" handed Gizmo a crock pot containing Nicole's hands; and

- Dr. Feig's testimony about Nicole's fatal chop injuries which matched the testimony and weapons found at the scene.

Given the strength of this non-accomplice evidence tending to connect Castillo to the murder, we do not find some harm. *See id*. at 633–34.

*Fulghum*

Fulghum was a stranger to 338 West Harlan, though he had met Gizmo through Nicole. Like Vargas, Fulghum testified he helped clean the scene and package the body, but only under duress, and nothing in the record contradicts Fulghum's account of the murder. His presence at the scene of the crime does not render him an accomplice witness. *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986). Nor does his work cleaning up the scene. *Druery*, 225 S.W.3d at 500. And although Fulghum continued to stay in the back house after the murder and lied to police about what happened, "a witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it." *Kunkle*, 771 S.W.2d at 439. Fulghum's uncontradicted account of the murder does not raise a fact issue on whether, prior to the criminal

event, Fulghum acted with the required culpable mental state for murder or a lesser-included offense of murder. *See Druery*, 225 S.W.3d at 500 ("The witness must still be susceptible to prosecution for the murder itself by having affirmatively assisted in committing the offense."); *cf. Harris v. State*, 645 S.W.2d 447, 459 (Tex. Crim. App. 1983). The trial court therefore correctly refused an accomplice instruction for Fulghum.

*Cleveland*

When Cleveland arrived at 338 West Harlan, the murder had already been committed. At Gizmo's request, Cleveland dumped the bags off W.W. White Road and denied that he knew the bags contained a body. When he returned to the house, Gizmo asked him to dispose of a crock pot with two hands in it. He refused, then contacted his attorney.

An accessory after the fact is not, as a rule, an accomplice witness. *Easter v. State*, 536 S.W.2d 223, 227–29 (Tex. Crim. App. 1976); *see Keegan v. State*, 681 S.W.2d 806, 812 (Tex. App.—Houston [14th Dist.] 1984, pet. ref'd) (evidence two men helped defendant hide body did not raise accomplice issue given absence of evidence they helped plan or execute murder). While there was evidence that Cleveland participated after the commission of the crime, there was no evidence Cleveland acted with the culpable mental state to commit murder. *See Paredes v. State*, 129 S.W.3d 530, 537 (Tex. Crim. App. 2004). The trial court did not err in failing to sua sponte give an accomplice-witness instruction for Cleveland.

*Conclusion on accomplice-witness instructions for Vargas, Fulghum, and Cleveland*

Although we find error in the failure to give an instruction for Vargas, we do not find harm. We do not find error in the failure to give an instruction for either Fulghum or Cleveland. We therefore overrule Castillo's third issue.

*Sufficiency of Non-Accomplice Evidence*

In his last issue, Castillo argues that because only the non-corroborated accomplice-witness testimony of Vargas, Fulghum, and Gizmo ties him to the crime, the evidence is insufficient. Castillo argues the remaining evidence neither resolves how Nicole died nor who killed her.

*Applicable Law and Standard of Review*

"When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case." *Id*. "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id*. "So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Id*. "Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id*.

*Application*

As discussed above, Fulghum's non-accomplice testimony connected Castillo to the offense charged. It tended to prove the allegations in the indictment that Castillo either: (A) intentionally or knowingly caused Nicole's death by striking her with an axe and dismembering her hands with a bladed instrument; or (B) with intent to cause serious bodily injury to Nicole, committed an act clearly dangerous to human life that caused the death of Nicole by striking her with an axe and dismembering her hands with a bladed instrument. Fulghum testified that Nicole's behavior provoked Castillo, they began arguing, and Castillo threatened Nicole. Fulghum tried to get Nicole to calm down. He then witnessed Castillo "go off" on Nicole. Castillo "grabbed some

tape and started taping her hands up." Then he picked up the machete and raised it. Fulghum turned his head away so he did not see what happened next, but he heard the machete strike three times. He saw "the stumps of her arms" as Nicole lay on the ground and he saw her lift her head. Castillo told her to stop moving and when she did not, he grabbed the axe, "swung it and buried it into her skull." Dr. Feig testified that either of the wounds inflicted could have been fatal. Castillo's DNA was found on a latex glove that also contained Nicole's blood. Through this evidence, the jury could have rationally determined that the combined force of all the non-accomplice evidence connected Castillo to Nicole's murder. *See id.* We therefore overrule his fourth issue.

## CONCLUSION

We affirm the judgment of the trial court.

Beth Watkins, Justice

DO NOT PUBLISH